**UNITED STATES of America,
Appellant,**

v.

**Nancy E. LAKE, Appellee.**

**No. 26206.**

United States Court of Appeals
Fifth Circuit.

Jan. 23, 1969.

Richard Brooks Harden, U. S. Atty., Tyler, Tex., Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Meyer Rothwacks, Harry Baum, Elmer J. Kelsey, Attys., Dept. of Justice, Washington, D. C., Howard A. Weinberger, Dept. of Justice, Fort Worth, Tex., for appellant.

Harry C. Weeks, Fort Worth, Tex., F. Wilbert Lasater, Tyler, Tex., Spruiell, Lowry, Potter, Lasater & Guinn, Tyler, Tex., Weeks, Bird, Cannon & Appleman, Fort Worth, Tex., of counsel, for appellee.

Before WISDOM, THORNBERRY, and GOLDBERG, Circuit Judges.

WISDOM, Circuit Judge:

Section 303[1] of the Internal Revenue Code of 1954 provides that a

---

1. § 303. Distributions in redemption of stock to pay death taxes

(a) In general.—A distribution of property to a shareholder by a corporation in redemption of part or all of the stock of such corporation which (for Federal estate tax purposes) is included in determining the gross estate of a decedent, to the extent that the amount of such distribution does not exceed the sum of—

(1) the estate, inheritance, legacy, and succession taxes (including any interest collected as a part of such taxes) imposed because of such decedent's death, and

(2) the amount of funeral and administration expenses allowable as deductions to the estate under section 2053 (or under section 2106 in the case of the estate of a decedent nonresident, not a citizen of the United States),

shall be treated as a distribution in full payment in exchange for the stock so redeemed.

(b) Limitations on application of subsection (a).—

(1) Period for distribution.—Subsection (a) shall apply only to amounts distributed after the death of the decedent and—

(A) within the period of limitations provided in section 6501(a) for the assessment of the Federal estate tax (determined without the application of any provision other than section 6501 (a)), or within 90 days after the expiration of such period, or

(B) if a petition for redetermination of a deficiency in such estate tax has been filed with the Tax Court within the time prescribed in section 6213, at any time before the expiration of 60 days after the decision of the Tax Court becomes final.

(2) Relationship of stock to decedent's estate.—

(A) In general.—Subsection (a) shall apply to a distribution by a corporation only if the value (for Federal estate tax purposes) of all of the stock of

redemption of stock, the value of which has been included in a decedent's gross estate for federal estate tax purposes, shall be considered as payment for the stock and entitled to capital gains treatment, rather than as a dividend (under § 301), up to the amount of the federal and state death taxes and the deductible administrative expenses. The policy justification is to prevent the forced sale to outsiders of stock in a family corporation. Here the taxpayer, Nancy Lake, daughter of the decedent, P. G. Lake, acquired stock in P. G. Lake, Inc. from a testamentary trust of which she is the beneficiary. She redeemed the stock and applied the proceeds to payment of the death taxes and expenses of her father's estate. We hold that in the factual context of this case the taxpayer is entitled to capital gains treatment of the stock under § 303.[2] Regulation 1.303-2(f),[3] declaring that § 303 is inapplicable to stock acquired by "purchase from any person to whom such stock has pass-

such corporation which is included in determining the value of the decedent's gross estate is either—

(i) more than 35 percent of the value of the gross estate of such decedent, or

(ii) more than 50 percent of the taxable estate of such decedent.

(B) Special rule for stock of two or more corporations.—For purposes of the 35 percent and 50 percent requirements of subparagraph (A), stock of two or more corporations, with respect to each of which there is included in determining the value of the decedent's gross estate more than 75 percent in value of the outstanding stock, shall be treated as the stock of a single corporation. For the purpose of the 75 percent requirement of the preceding sentence, stock which, at the decedent's death, represents the surviving spouse's interest in property held by the decedent and the surviving spouse as community property shall be treated as having been included in determining the value of the decedent's gross estate.

(c) Stock with substituted basis.— If—

(1) a shareholder owns stock of a corporation (referred to in this subsection as "new stock") the basis of which is determined by reference to the basis of stock of a corporation (referred to in this subsection as "old stock"),

(2) the old stock was included (for Federal estate tax purposes) in determining the gross estate of a decedent, and

(3) subsection (a) would apply to a distribution of property to such shareholder in redemption of the old stock, then, subject to the limitation specified in subsection (b) (1), subsection (a) shall apply in respect of a distribution in redemption of the new stock. Aug. 16, 1954, c. 736, 68A Stat. 88.

2. Provided, of course, that the other requirements of § 303 are met.

3. Treas.Regs. § 1.303-2(f): While section 303 will most frequently have application in the case where stock is redeemed from the executor or administrator of an estate, the section is also applicable to distributions in redemption of stock included in the decedent's gross estate and held at the time of the redemption by any person who acquired the stock by any of the means comprehended by part III, subchapter A, chapter 11 of the Code, including the heir, legatee, or donee of the decedent, a surviving joint tenant, surviving spouse, appointee, or taker in default of appointment, or a trustee of a trust created by the decedent. Thus section 303 may apply with respect to a distribution in redemption of stock from a donee to whom the decedent has transferred stock in contemplation of death where the value of such stock is included in the decedent's gross estate under section 2035. Similarly, section 303 may apply to the redemption of stock from a beneficiary of the estate to whom any executor has distributed the stock pursuant to the terms of the will of the decedent. However, section 303 is not applicable to the case where stock is redeemed from a stockholder who has acquired the stock by gift or purchase from any person to whom such stock has passed from the decedent. Nor is section 303 applicable to the case where stock is redeemed from a stockholder who has acquired the stock from the executor in satisfaction of a specific monetary bequest.

ed from the decedent", should not be interpreted as precluding such treatment.

\* \* \*

From the time P. G. Lake, Inc. entered business in 1936, it has been owned exclusively by, or held for, the immediate members of the Lake family, including Nancy. The Company's outstanding stock has at all times consisted of 100,000 shares of "Class A" common and 200,000 shares of "Class B" common. Only Class B owners are entitled to vote.

On September 1, 1956, all of the owners of the capital stock, except seven grandchildren of P. G. Lake, who were then minors, entered into a "Buy and Sell Agreement" designed to keep the Company in the hands of the Lake family. The agreement, which was to last 20 years, permitted inter vivos donations of the stock to members of the family but prohibited any other transfers of the stock except subject to the right of the other owners to buy the stock at a fixed price: $16 per Class A share, $18 per Class B share. Donees, by accepting the stock, became parties to the agreement.

P. G. Lake died testate on June 14, 1965. At the time of his death he owned 68,175 shares of Class A stock and 59,900 shares of Class B stock. A federal estate tax form filed September 9, 1965, included these shares, at the agreed valuation. The total value of the stock, $2,169,000, exceeded 35 percent of the gross estate and 50 percent of the taxable estate, two of the conditions fixed in § 303. The Internal Revenue Service raised the valuation of each class to $25 per share, but later acquiesced in the lower evaluation set by the estate.[4]

P. G. Lake's duly probated will left his entire estate after taxes and costs (except for a bequest of $10,000 to a brother) in equal shares to four trusts: one for the benefit of Nancy Lake and a separate trust for the benefit of each of her three full brothers. Each trust was to continue for the life of its beneficiary with the corpus to pass to whom the beneficiary might appoint under a limited power of appointment, or if this power was not exercised, to the beneficiary's heirs-at-law. One-half of the corpus, however, was to be distributed to the beneficiary ten years after the testator's death, or upon the beneficiary's fifty-fifth birthday, whichever came later. All four trusts contained "spendthrift" clauses, and the income was distributable to the beneficiaries periodically at the discretion of the trustees.

On September 1, 1965, Nancy Lake and her three full brothers signed an agreement with the executors of the Lake estate providing, in effect, that each of them was to acquire outright all the P. G. Lake, Inc. stock in his respective trust by paying the executor $16 per Class A share and $18 per Class B share. In short, they executed their option under the 1956 agreement.[5] Nancy Lake and her brothers financed their acquisitions by borrowing $2,169,000 from the Citizens' First National Bank of Tyler. Nancy Lake's loan amounted to $542,238 and was secured by a pledge of all the stock she acquired from the executor, as well as the stock she previously owned in P. G. Lake, Inc.

The lending bank insisted as a term of the loans that the Internal Revenue Service subrogate its estate-tax lien to the security interest of the bank. The IRS agreed, provided that the estate's proceeds from the transfer of the stock were placed in escrow for payment of

---

4. The executors of the P. G. Lake estate challenged the I.R.S. evaluation of the stock in a suit that was pending at the time that the present action was heard below. The Government reversed its position prior to final judgment, however, and refunded the extra taxes administratively.

5. The apparent purpose of executing the option was to provide evidence that the value of the stock for estate-tax purposes was $16 per share of Class A and $18 per share of Class B.

the estate taxes. The $1,772,858.40 of federal estate taxes claimed by the Government, and the state inheritance taxes of $224,736.74 were paid from the escrow fund, and the net proceeds were returned to the estate. These remaining funds became the corpus of the four testamentary trusts.

The taxable transfer giving rise to this suit occurred on December 8, 1966, when Nancy Lake surrendered to P. G. Lake, Inc. for redemption 200 shares of her stock, receiving $16 a share from the Company. The specific shares surrendered were among those that had passed through P. G. Lake's estate and had been acquired from the executors under the "Buy-Sell Agreement". Shortly after surrendering the stock Nancy Lake paid the redemption proceeds, $3200, over to the Citizens' First National Bank of Tyler, in partial payment of the loan she had earlier executed to finance the acquisition of the stock from the estate. In her federal income tax return for 1966, she listed the $3200 as dividends, taxable at ordinary income rates.

On January 3, 1967, Nancy Lake duly filed with District Director of Internal Revenue at Dallas, Texas, a claim for $1600, based on the contention that the proceeds of the redemption should have been treated as the proceeds of an exchange under § 303 of the Code. The IRS rejected the claim, and this suit followed. On cross claims for summary judgment the district court held that Miss Lake had not "purchased" the stock she later redeemed, and that she therefore did not fall within the purview of Treasury Regulations § 1.303–2(f) excluding purchasers from the exchange treatment provided by § 303. The court held, in the alternative, that the regulation is invalid insofar as it limits a statute which is plain, unambiguous, and contains no limitations. The court awarded judgment to Miss Lake. The Government now appeals.

## I.

### The Statutory Scheme

Before determining whether Nancy Lake's redemption falls within § 303, we must examine the scheme imposed by this section and its related regulations.

Section 303 of the 1954 Code is an expanded version of a 1950 provision that liberalized § 115(g)(3) of the 1939 Code. See the Revenue Act of 1950 (c. 994, 64 Stat. 906, § 209(a)). The legislative history of the provision shows that the dominant object moving Congress to grant the relief was the hardship to heirs when a large part of the value of an estate's assets consists of stock in a family corporation that would have to be sold, perhaps at a distressed value, to pay death taxes. A subsidiary object was to bolster the economic competition by protecting family businesses against forced sales, perhaps in an oligopolistic industry. The House Committee on Ways and Means stated the purposes of § 303 as follows:

It has been brought to the attention of your committee that the problem of financing the estate tax is acute in the case of estates consisting largely of shares in a family corporation. The market for such shares is usually very limited, and it is frequently difficult, if not impossible, to dispose of a minority interest. If, therefore, the estate tax cannot be financed through the sale of the other assets in the estate the executors will be forced to dispose of the family business. In many cases the result will be the absorption of a family enterprise by larger competitors, thus tending to accentuate the degree of concentration of industry in this country. * * * ¶ Your committee is of the opinion that remedial action is desirable in order to prevent the enforced sale of the family businesses which are so vital and desirable an element in our system of free private enterprise. (H. Rept. No. 2319, 81st Cong., 2d Sess., 1950–2 Cum. Bull. 380, 427–428.)

It was thought that by facilitating redemption, as opposed to external sale of the stock, such undesirable consequences could be avoided.

A single sentence in the report of the Senate Committee on Finance does state: "The exception, however, is not applicable to the redemption of stock from a purchaser for value thereof even though such stock was includable in a decedent's gross estate." S. Rep. No. 2375, 81st Cong. 2d Sess. p. 83 (1950 Cum. Bull. 482, 542). The Senate Committee did not attempt to implement this statement by amending the language of the section and there is nothing to indicate that the statement was considered by the Ways and Means Committee, by the Conference Committee, or by either body of Congress. The Finance Committee reported in the language of the Ways and Means Committee, that "remedial action is desirable in order to prevent the enforced sale of the family businesses * * * ". Looking at the report as a whole, it seems to us that the Finance Committee's reference to "purchasers" meant ordinary purchasers, i.e. strangers; that the Committee would not have denied the benefits of the section to the intra family arrangements within the Lake family designed to prevent the distressed sale of P. G. Lake, Inc.

■ For a taxpayer to qualify for coverage under § 303, as originally enacted, it was necessary for the stock to have been included in the estate of the decedent for federal estate-tax purposes, and the value of the stock redeemed had to comprise more than 50 percent of the value of the net taxable estate. The 1951 Revenue Act, § 320, amended the provision to require 35 percent of the value of the gross estate, and dropped the 50 percent test. When the 1954 Code was enacted the two tests were adopted in the alternative. Since in some cases the 50 percent taxable estate test will be much the easier to satisfy, it may be said that the congressional trend has been in the direction of liberalizing the redemption provision. If either of these tests is met, amounts distributed in redemption of the stock are entitled to capital gains treatment to the extent that the distribution does not exceed the sum of the estate, inheritance, legacy, and succession taxes and the funeral and administration expenses.[6]

6. Under § 301, a distribution of property by a corporation is taxed at ordinary income-tax rates if the distribution is a dividend. A dividend is defined in § 316 (a), as a distribution of property out of the earnings and profits of the corporation. For the purposes of §§ 301 and 316(a), property includes money, securities, and any other property except stock in the corporation making the distribution. Int.Rev.Code of 1954, § 317(a). When a corporation purchases its stock from a shareholder, the purchase is a redemption, and unless the redemption does not fall within certain exceptions provided in the Code, it is taxed as a distribution of property under § 301. Int.Rev.Code of 1954, § 302. Section 303 is one exception to § 301 and allows capital gains treatment on distribution in redemption of stock to pay death taxes and expenses.

When a distribution is treated as a dividend under § 301(c), that portion of the distribution which is a dividend is included in gross income, while that portion which is not a dividend reduces the adjusted basis of the remaining stock. The basis of the remaining stock, however, can never be reduced below zero since any excess over the amount of the adjusted basis is taxed at capital gains rates. Int.Rev.Code of 1954, § 301(c) (3) (A). Even though a redemption results in a disposition of the stock by the shareholder, some stock must remain in the shareholder's hands if the distribution is taxed as a dividend because § 302(b) (2) exempts from dividend treatment redemptions that are substantially disproportionate in relation to the remaining stock and that result in a 50 per cent reduction in the amount of stock owned by the shareholder.

Besides the benefits afforded by § 303, a shareholder will also benefit from stock that he obtains through an estate because their stock will receive a stepped-up basis in his hands. Int.Rev.Code of 1954, § 1014(b) (9). This increase in basis will defer recognition of gain or loss since it provides a larger amount

■ Although § 303 is captioned "Distributions in redemption of stock to pay death taxes", its coverage is broader than the caption suggests. As observed by Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders 306 (Stud. ed. 1966):

> The statement in the 1950 House Report that "the circumstances under which * * * relief is available are narrowly defined and will restrict relief to situations in which true hardship exists" (H. Rept. No. 2319, supra, 428) is not an accurate description either of the 1950 legislation or of § 303 as it exists today.

Section 303 may apply regardless of the estate's liquidity; an estate may possess sufficient cash to pay the death taxes and expenses, but qualifying stock can nonetheless be redeemed at capital gains rates up to the full amount of taxes and expenses payable. Moreover, this section does not require that amounts received in redemption be used to pay the taxes and expenses, and therefore, stockholders may be able to redeem stock that is included in the estate of the decedent even though they have no obligation to pay any of the death taxes or expenses.[7]

■ The Treasury regulations relating to § 303 are designed to limit the broad applicability that the language of the statute would otherwise allow. The scheme set up by Regulations § 1.303–

2(f) envisions that the executor or administrator of the estate will most frequently be the party who redeems the stock and therefore affords capital gains treatment to redemption proceeds in his hands. This regulation also allows capital-gains treatment to a beneficiary to whom the executor has distributed the stock, and to any person who acquired the stock by the means comprehended by §§ 2031–44, including specific legatees of stock, donees of gifts in contemplation of death, and trustees of inter vivos trusts, whether or not any of them are responsible for the taxes and expenses.

Regulations § 1.303–2(f) also attempts, however, to limit the benefits of § 303 to those actually responsible for the death taxes and expenses. To that end it excludes from § 303 coverage donees or purchasers from a person to whom the stock passed from the decedent, and persons receiving stock from the executor in satisfaction of a specific monetary request. Apparently the authors of the regulation considered that usually purchasers of stock will not have to pay the taxes and expenses of the estate through which it has passed and do not therefore deserve the benefits of § 303. This limitation upon § 303, however, fails to confine its benefits to those who are responsible for the death taxes and expenses since it fails to exclude legatees, donees of gifts in contemplation of

that may be reduced under § 301(c) (3) (A) and will also reduce the amount of gain that will ultimately be realized by providing the shareholder with a larger basis than he otherwise would have.

7. Since § 303 does not limit capital gains treatment to those who must bear the death taxes and expenses, it does not limit the total amount that may be distributed at capital gains rates. The statute says only that distributions in redemption shall get favored treatment "to the extent" of the sum of the taxes and expenses. It is therefore theoretically possible that each redeeming shareholder whose stock passed through the estate could get capital gains treatment up to the full amount of the taxes and expenses. Regulations § 1.303–2(g),

however, limits the total amount of the distributions in redemptions entitled to capital gains treatment to the total amount of taxes and expenses, but it fails to specify how the capital gains treatment should be allocated among the distributions, assuming the distributions exceed the total amount of the taxes and expenses. The method of allocation, either on a chronological, first-come-first-served basis, or on a pro-rata basis, determines who, as between all the shareholders, is entitled to the benefit of capital gains treatment on the proceeds of the redemptions. Section 303 also does not require that the distribution must be made in liquid assets: a corporation may distribute a note in redemption of the stock. See Rev. Rul. 65–289, 1965–Z Cum.Bull. 86.

death, and trustees of inter vivos trusts who, like purchasers, may not be responsible for the taxes and expenses. The omission in the statute of a provision limiting capital gains treatment to those who must pay the taxes and the failure of the regulation to focus on the purpose of the statute as a basis for determining its coverage give rise to this suit.

## II.

### Nancy Lake's Redemption

A. With this outline of the statutory scheme as background, we proceed to review the first holding of the district court, that Nancy Lake did not "purchase" the stock she later redeemed, and that Treasury Regulations § 1.303–2(f) therefore does not apply to her.

Nancy Lake seeks to place herself beyond the coverage of the regulation by the following reasoning. Under Texas law, the beneficiary of a testamentary trust "acquires a legal estate in the property, against all persons except the trustees and those lawfully claiming under them".[8] Thus, Miss Lake contends, she already owned the stock before she supposedly "purchased" it under her option. Since one cannot purchase what she already owns, the acquisition could not have been accomplished by purchase.

We are unpersuaded by this argument, despite its adoption by the district court. It amounts, essentially, to a play on words. The Texas law in question relates to state inheritance rules and the relative rights of executors, trustees, and beneficiaries. Regardless of whether she was labelled the "owner" of the stock before December 8, 1966, there can be no doubt that after December 8, in return for a substantial cash sum, she received certain rights that she had not previously enjoyed. These rights included the power to dispose of all the stock without the restriction of a limited power of appointment, the right to vote the stock in corporate elections, and the right to receive dividends as they were distributed without the possibility of in-

tervention by the trustee. The argument that Miss Lake could not have bought the stock from herself does not, therefore, fit the facts. The rights she originally had in the stock were less than complete; there was an additional bundle of rights that she obtained only by transferring money to the trustee in return for record title to the stock.

Moreover, the argument that she originally owned the stock under Texas law is inapposite here. The question we must decide is whether the transfer of additional rights in the stock constituted a "purchase" not for the purposes of Texas estate law, but for the purposes of § 303 and the related Treasury regulations.

B. "Purchase", as employed in the regulation should be construed in light of the policies that moved Congress to adopt § 303. The Congressional purpose, as we have noted above, was to avoid dividend taxation of proceeds used to pay death taxes, administrative costs, and funeral expenses. Since the statute was drawn more broadly than its strict purpose would justify, the Treasury sought to limit its applicability by withholding § 303 benefits from redeeming parties who acquired their stock by purchase. The restriction, it may be conceded, makes sense: Shareholders who purchase stock that has passed through an estate do not usually bear the brunt of the estate taxes and expenses. If A dies and bequeaths his stock to B, whose testamentary share is diminished by estate taxes, and B later sells the stock to C, it is difficult to see why C, upon redeeming the stock, should enjoy the tax advantages merely because the stock passed at one point through A's estate. Nothing on the face of the statute, however, would preclude that result. It was to eliminate the abuses which a literal reading of § 303 might allow that the Regulation provided for the exclusion of purchasers.

It is fundamental, however, that the language of statutes and reg-

---

8. Vernon's Tex.Rev.Civ.Stat.Ann. art. 7425b–43 (1960).

ulations, insofar as they admit more than one meaning, cannot be read in isolation. They must be construed with the congressional purpose in mind. Since the purpose of the "purchase" exclusion is to deny special treatment to those who do not redeem stock in order to pay estate taxes, it should not be extended to cover those who *do* redeem to pay estate taxes.

 If faced with the abstract question of whether Nancy Lake "purchased" her stock here, or acquired it, as the Texas law cited would indicate, by means of devise, we might be inclined to say that she purchased the stock. But we cannot ignore the fact, appearing plainly from the record, that Miss Lake, however she acquired the stock, employed the redemption proceeds for the very purpose Congress had in mind: to satisfy estate and death tax liabilities of the estate through which the stock had passed. That is the critical fact in this case. It should not matter whether she did so indirectly, by first paying the executor borrowed money (which he in turn used to pay the estate taxes) and then repaying the loan with the proceeds of the redemption. What matters is that having a substantial relationship to the estate as daughter of the decedent and as a beneficiary of the will, she used the redemption proceeds to provide cash for the payment of estate taxes. The redemption that would be required to pay the estate taxes, if exchange treatment were not granted would be considerable.[9] Given this fact, and the ambiguity created by the taxpayer's acquisition of the stock from her own trust, we think that Regulations § 1.303–2(f) should not be construed to cover Nancy Lake's redemption. We are strengthened in this conclusion by the serious doubts we would have concerning the validity of the regulations if it were interpreted otherwise. As we have suggested, the regulation departs from the literal wording of § 303, since

nothing in the language of the statute indicates an exception for purchasers from its general coverage. If a justification exists for the creation of such an exception, it is only that the exception furthers the ends of the statute, or is at least consistent with them. The justification, and the enforceability of the regulation, fail where the taxpayer excluded is precisely the type of taxpayer meant to be protected by the underlying statute, § 303. When the applicability of a regulation is in doubt, as it initially was in this case, we prefer to construe it flexibly, and thereby preserve its validity, rather than adopt a rigid interpretation that might require us to strike down the provision as "unstatutory". For that reason, as well as to vindicate the purpose of the regulation, we hold that Nancy Lake was not a "purchaser" within the meaning of Regulations § 1.303–2(f) and that she was entitled to exchange treatment upon the redemption of her P. G. Lake, Inc. stock, as provided by § 303 of the Code.

We disclaim any implication that we hereby approve, or disapprove, of the use of the option prices, $16 and $18, to evaluate the respective classes of stock in P. G. Lake's estate. Since we hold that the execution of the option was not a "purchase" for the purpose of Treas. Regs. § 1.303–2(f), we make it doubly clear that our decision today does not categorize the execution as a "purchase", arms'-length or otherwise, for the purpose of establishing the fair-market value of the stock.

Having decided that the regulation is inapplicable within the factual context this case presents, we need not go beyond the views expressed in the previous paragraphs to rule formally upon the validity of the regulation. It is enough to hold that the regulation does not extend to Nancy Lake's redemption of her P. G. Lake, Inc. stock on December 8, 1966.

The judgment is affirmed.

9. According to Nancy Lake's brief, if exchange treatment were not granted, the corporation would have to distribute approximately $5,000,000 to fund the death

duties. This sum represents a substantial portion of the corporation's total worth.