**Brian G. and Maureen HARRISON**

v.

**UNITED STATES of America.**

**Civ. A. No. 78–1576.**

United States District Court,
E. D. Pennsylvania.

July 24, 1979.

Paul S. Kimbol, Dechert Price & Rhoads, Philadelphia, Pa., for plaintiffs.

Gregory S. Hrebiniak, Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant.

## OPINION

LUONGO, District Judge.

Section 57(a)(6) of the Internal Revenue Code [1] provides that with respect to stock

---

1. Except for the sections governing procedure, Code references in this opinion are to the Internal Revenue Code of 1954, as amended and in effect in 1971, the taxable year in question, unless otherwise indicated.

transferred pursuant to the exercise of a qualified or a restricted stock option, "the amount by which the fair market value of the share at the time of exercise exceeds the option price" constitutes an item of tax preference subject to the minimum tax under § 56. Section 1.57–1(f)(3) of the Treasury Regulations, first proposed on December 30, 1970, see 35 Fed.Reg. 19757 (1970), and finally adopted on September 12, 1978, see 43 Fed.Reg. 40459 (1978), throws some light on "fair market value" and provides that the item of tax preference "is to be determined without regard to restrictions (other than nonlapse restrictions within the meaning of [Treas.Reg.] § 1.83–3(h))."

This suit presents a challenge to the aforementioned method of valuation. Applying the principles prescribed by § 1.57–1(f)(3), the Internal Revenue Service (IRS) determined that the plaintiff-taxpayer[2] had received an item of tax preference in 1971 and assessed a deficiency. Plaintiff paid the assessment, filed a timely claim for refund, and after six months had elapsed without agency action, instituted this suit pursuant to I.R.C. § 7422, alleging jurisdiction under 28 U.S.C. § 1346 (1976). Presently before me is the Government's motion for summary judgment. After consideration of the arguments advanced by the parties in their memoranda, I agree with the Government that the valuation mechanism outlined in the challenged regulation is legally sound.

The principal facts, to which the parties have stipulated, are as follows. On January 24, 1967, Harrison entered into a stock option agreement (qualified under I.R.C. §§ 421, 422) with General Numismatics Corporation, the predecessor to Franklin Mint Corporation (Franklin Mint). On November 24, 1971, while he held the position of Executive Vice-President of Franklin Mint,

Harrison exercised the option to purchase 12,000 shares of Franklin Mint common stock at the option price of $1.08 per share.[3] Although the trading price of the stock on the American Stock Exchange on the date of exercise was considerably higher than the price paid by Harrison, he did not report the transaction as an item of tax preference (subject to the minimum tax imposed by I.R.C. § 56) on his 1971 federal income tax return. After an audit of that return, the IRS concluded that plaintiff's exercise of the option generated a tax preference. In determining the amount of the preference, the IRS set the fair market value of the stock acquired under the option at $42.25 per share, which was the highest trading price of the Franklin Mint stock on the American Stock Exchange on November 24, 1971, the date of exercise. The IRS assessed the deficiency for 1971 at $44,110, which plaintiff paid together with interest in the amount of $15,368.19. He subsequently complied with the procedural prerequisites to a judicial adjudication of his claim and now petitions this court for a refund of the $59,478.19, plus interest and costs.

Whether the plaintiff is entitled to recover all or a part of the claimed refund depends, of course, upon whether the amount of the tax preference determined by the IRS accurately reflects the bargain element of the stock acquired under the option. Harrison, an executive officer of Franklin Mint when he exercised the option, takes the position that § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) (1976), which requires a corporate director or officer to disgorge to the corporation any profits realized from the sale of the corporation's stock within six months of its acquisition, is a restriction that significantly

---

**2.** Mrs. Harrison is a party to this action only because she filed a joint return with her husband in 1971.

**3.** The original option agreement gave Harrison the right to purchase 4,000 shares of General Numismatics stock at $6.50 per share. By the

fifth option year, however, as a result of a stock dividend and several stock splits, plaintiff had an option to purchase 24,000 shares of Franklin Mint stock at $1.08 per share. Amended Stipulation of Facts (Document No. 18) ¶¶ 1–2.

affects the fair market value of the stock. Harrison advances two alternative arguments: (1) that the fair market value is the option price, and (2) that the effect of the § 16(b) restriction on the fair market value of the stock creates a material issue of fact which requires expert testimony and which must therefore be reserved for trial.[4]

In moving for summary judgment, the Government argues that § 1.57–1(f)(3) prohibits consideration of all stock restrictions except nonlapse restrictions, and that inasmuch as § 16(b) is not a nonlapse restriction, the impact of § 16(b) may not be taken into account when calculating the fair market value of the transferred stock. As the regulation states,[5] the prescribed method of valuation derives from § 83(a)(1) of the Code. Section 83, as a general proposition, requires that the bargain element of property transferred in connection with *the performance of services* be included in the *gross income* of the person who rendered the services. In calculating this addition to income, "the fair market value of such property [is] determined without regard to any restriction other than a restriction which by its terms will never lapse . . ." I.R.C. § 83(a)(1). The regulations define a nonlapse restriction as

a *permanent* limitation on the transferability of property

(i) Which will require the transferee of the property to sell, or offer to sell, such property at a price determined under a formula, and

(ii) Which will continue to apply to and be enforced against the transferee or any subsequent holder (other than the transferor).

. . . *Limitations imposed by the registration requirements of State or Federal security laws or similar laws imposed with respect to sales or other dispositions of stock are not nonlapse restrictions.* Treas.Reg. § 1.83–3(h) (emphasis added).

The language of the regulation is quite explicit. Clearly, the requirement that insider profits resulting from the purchase and sale of stock within a six-month period inure to the corporation is not a nonlapse restriction. Section 16(b) applies only to the insider, not to the transferee. Furthermore, its proscription is of limited duration, applying only to purchases and sales occurring within six months of each other. Therefore, the Government is correct in its assertion that the effect of § 16(b) on the market value of stock acquired by an insider should be excluded when valuing the stock both under § 83(a)(1) (for income tax treatment) and, through § 1.57–1(f)(3)'s incorporation of the § 83(a)(1) valuation mechanism, under § 57(a)(6) (for minimum tax treatment).

Harrison attempts to overcome the obstacle created by § 1.57–1(f)(3) by attacking the validity of that regulation. He argues that by adopting the principles of § 83(a)(1), the regulation directly violates § 83(e)(1), which declares § 83 inapplicable to a transaction to which § 421 applies. Section 421 embraces qualified stock options (defined in I.R.C. § 422(b)) and restricted stock options (defined in I.R.C. § 424(b)) which (according to § 57(a)(6)) are subject to the minimum tax. Harrison contends that because the stock options to which § 57(a)(6) applies are by definition transactions within the purview of § 421, § 83(e)(1) flatly prohibits the use of § 83 valuation principles.

This precise issue has been resolved against the taxpayer by the Tax Court in *Kolom v. Commissioner,* 71 T.C. 235 (1978). The majority opinion in *Kolom* distin-

---

**4.** The provision in the option agreement that the optionee sign a letter of investment was apparently not enforced, and plaintiff makes no contention that a letter of investment affected the fair market value of the stock acquired under the option. Amended Stipulation of Facts (Document No. 18) ¶ 11.

**5.** Treas.Reg. § 1.57–1(f)(3) provides:
"In accordance with the principles of section 83(a)(1), the fair market value of a share of stock received pursuant to the exercise of a qualified or restricted stock option is to be determined without regard to restrictions (other than nonlapse restrictions within the meaning of § 1.83–3(h)). Notwithstanding any valuation date given in section 83(a)(1), for purposes of this section, fair market value is determined as of the date the option is exercised."

guished the primary objectives of sections 57 and 83, noting that "the regulations [explaining § 57(a)(6)] do not provide for inclusion in a taxpayer's *taxable income* of the value of the stock received upon exercise of a qualified stock option." 71 T.C. at 241, [1978] Tax Ct.Rep. (CCH) at 3687 (emphasis added). In holding the challenged regulation consistent with the statute, the court determined that while § 83 may not be applied so as to render the bargain element of a § 421 transaction subject to the *income tax*, § 83's valuation principles may be used for an entirely different purpose—determining items of tax preference for purposes of the *minimum tax.*

Harrison urges that I adopt the position expressed by the two judges who concurred only in the *Kolom* result, *i. e.*, that the regulation and the statute are irreconcilable. Suggesting that a share of stock transferred to an insider "provides significantly less compensation to him than would an otherwise identical share awarded to a person not so subject," the concurring judges believed that the regulation overreached § 57(a)(6). They pointed to the definition in § 57(a)(6) of tax preference (the excess of "fair market value" over the option price) and stated that "the statute nowhere authorizes [the Commissioner] to use, as he does, a figure clearly in excess of fair market value." 71 T.C. at 251–52.[6]

■■■ Bearing in mind the maxim that "Treasury Regulations are 'contemporaneous constructions by those charged with administration of' the tax laws and are to be 'sustained unless unreasonable and plainly inconsistent with the revenue statutes,'" *Vorbleski v. Commissioner,* 589 F.2d 123, 127 (3d Cir. 1978) (quoting *Bingler v. Johnson,* 394 U.S. 741, 749–50, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969)), I agree with the reasoning of the *Kolom* majority. Courts have scrupulously avoided interpretations that cast doubt on the validity of regulations, *see, e. g., United States v. Lake,* 406 F.2d

941, 950 (5th Cir. 1969); *Fuller Brush Co. v. United States,* 262 F.Supp. 989, 999 (D.Conn.1966), and I will follow suit.

As the *Kolom* majority noted, the objectives of the three statutes—sections 57, 83, and 421—belie the charge of inconsistency. Section 421 *excludes from gross income* the addition to income realized by a corporate employee from stock transferred either upon the exercise of a qualified or a restricted stock option or pursuant to an employee stock purchase plan. Section 83 provides for the *inclusion in gross income* of the bargain element of property transferred in connection with the performance of services. Section 83(e)(1) explicitly resolves any potential conflict between sections 83 and 421 by specifically preserving the exclusion of § 421 transactions from income tax treatment. Section 57(a)(6), on the other hand, subjects the bargain realized by taxpayers upon the exercise of qualified and restricted stock options—an amount which would be included in the taxpayers' gross income but for the preferential treatment afforded by § 421 and § 83(e)(1)—to an entirely different tax treatment, *i. e.*, the minimum tax imposed by § 56. It is obvious that § 1.57–1(f)(3) has no effect whatsoever upon § 421 transactions from the standpoint of the income tax. Consequently, inasmuch as the exception of § 421 transactions from income tax treatment remains intact, the incorporation of the valuation mechanism of § 83(a)(1) appears inoffensive. Certainly, I have not been persuaded that the regulation is "plainly inconsistent" with the statute

The taxpayer also contends that the concept of fair market value in § 83(a)(1) is at odds with the standard contemplated by Congress in drafting § 57(a)(6). To support his contention, Harrison points to the absence in § 57(a)(6) of language qualifying fair market value such as that in § 83(a)(1). He suggests that

"[W]hile there is no question that Congress could have chosen to use the same

---

6. This, of course, begs the question. It assumes, as a legal premise, one of the very issues raised by the challenge to the regulation

—whether, but for the regulation, fair market value *would* include a discount for the effect of § 16(b) and other nonlapse restrictions.

principles for the determination of fair market value under both § 57 and § 83, Congress clearly did not do so but, rather, specifically prohibited the use of the rules under § 83 in valuing stock acquired on the exercise of a qualified stock option." Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Document No. 14) at 10.

He contends that the correct valuation principles may be gleaned from the estate tax regulations, which outline the general understanding of fair market value used throughout the Code in the absence of a specific statutory rule. Fair market value is defined in those regulations as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Treas. Reg. § 20.2031–1(b); *see United States v. Cartwright*, 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973); *Amerada Hess Corp. v. Commissioner*, 517 F.2d 75, 83 (3d Cir.), *cert. denied* 423 U.S. 1037, 96 S.Ct. 574, 46 L.Ed.2d 412 (1975). This regulation further provides that "[a]ll relevant facts and elements of value as of the applicable valuation date shall be considered in every case." Treas. Reg. § 20.2031–1(b). To the same effect is regulation § 20.2031–2. Even while stating a special rule of valuation for stocks and bonds,[7] § 20.2031–2 similarly provides that if the specified valuation method "does not reflect the fair market value [of the stock or bond], then some reasonable modification of that basis or other relevant facts and elements of value are considered in determining the fair market value." Treas. Reg. § 20.2031–2(e).

In support of his contention that the restrictive potential of § 16(b) has entered and should enter into the calculus of fair market value, Harrison points to several decisions, one by a court of appeals and two by the Tax Court. In *MacDonald v. Commissioner*, 230 F.2d 534 (7th Cir. 1956), the Court of Appeals for the Seventh Circuit reversed the decision of the Tax Court, which had held that the difference between the option price and the trading price of stock transferred under an option represented the amount of compensation received by the taxpayer. The taxpayer had argued on appeal that an agreement not to sell the shares while he was an employee of the corporation, and § 16(b), prevented the stock acquired under the option from having an ascertainable fair market value. In remanding the case to the Tax Court, the court of appeals indicated its disagreement with the Tax Court's method of valuation and expressed the opinion that the restrictions resulting from the agreement not to sell, and § 16(b), might affect fair market value. *Id.* at 540–41.

The two Tax Court decisions are *Husted v. Commissioner*, 47 T.C. 664, 679 (1967), in which the court recognized that the possible applicability of § 16(b) constituted a deterrent to the sale of the stock in question for a period of six months and took this factor into consideration when fixing the fair market value, and *Hirsch v. Commissioner*, 51 T.C. 121, 134–35 (1969), which acknowledged that stock acquired under an option, with an agreement that it be held for six months and which was subject to the registration requirement of the Securities Act of 1933, had been purchased with restrictions having a significant effect on fair market value.

Whether the attitude evidenced in the foregoing opinions reflects the congressional understanding of fair market value as used in § 57(a)(6) is, at best, questionable.[8]

---

**7.** "In general, if there is a market for stocks or bonds, on a stock exchange, in an over-the-counter market, or otherwise, the mean between the highest and lowest quoted selling prices on the valuation date is the fair market value per share or bond." Treas. Reg. § 20.-2031–2(b)(1).

**8.** Indeed, I find these decisions utterly unpersuasive with respect to the proposition that § 16(b) has an effect on fair market value. They merely enumerate § 16(b) as one factor, among many, that may have some impact upon the value of the stock, without really inquiring into what that impact may be. As I state later in this opinion, it is my view that although § 16(b) may have financial consequences to an

Undermining the taxpayer's argument is Revenue Ruling 68–286, 1966–1 Cum.Bull. 185, which states that the provisions of § 16(b) do *not* affect fair market value.[9] Obviously, inasmuch as both the cases and the revenue ruling predate the enactment of § 57(a)(6), it is possible to attribute to Congress either of the divergent views.

Resort to the legislative history of § 301(a) of the Tax Reform of 1969, P.L. No. 91–172, 83 Stat. 581, which added the provisions for the minimum tax, is singularly unenlightening. The Senate Report speaks very generally to the congressional intent to achieve a more equitable distribution of the tax burden by taxing items of economic income that had previously received preferential treatment. S.Rep. No. 91–552, 91st Cong. 1st Sess./(1969), *reprinted in* [1969] U.S.Code Cong. & Admin.News pp. 2027, 2142. Unfortunately, the portion of the Senate Report that specifically addresses the inclusion for minimum tax purposes of the bargain reaped by the taxpayer upon the exercise of qualified and restricted stock options merely reiterates the statutory language.

Although the legislative history of § 57(a)(6) provides no guidance in divining whether the regulation comports with the congressional intent, the survival of § 57(a)(6) in its original form, without clarification, through subsequent amendments to the statute is some indication that the regulation correctly explicates the statute. *Cf. United States v. Correll*, 389 U.S. 299, 88 S.Ct. 445, 19 L.Ed.2d 537 (1967); *Commissioner v. Anderson*, 371 F.2d 59 (6th Cir. 1966), *cert. denied*, 387 U.S. 906, 87 S.Ct. 1687, 18 L.Ed.2d 623 (1967). Section 1.57–1(f)(3), the regulation interpreting "fair market value" as used in § 57(a)(6), was initially proposed on December 30, 1970. *See* 35 Fed.Reg. 19757 (1970). Although the regulation was not formally adopted until September 12, 1978, *see* 43 Fed.Reg.

40459 (1978), it remained in substantially the same form throughout the interim period. *Compare id.* at 40464 *with* 35 Fed.Reg. at 19764. Between the dates of the proposal and the adoption of the regulations, § 57 has been amended several times—in 1971, 1976, and 1977; it was also amended in 1978, subsequent to promulgation of the regulation. Yet, during this time § 57(a)(6) has remained unchanged. This congressional inaction with respect to § 57(a)(6) presents silent testimony that the regulation forwards the congressional intent.

Furthermore, the regulation appears reasonable and consistent with the legislative purpose when viewed in the context of the 1976 amendments to sections 422 and 424. *See* Tax Reform Act of 1976, Pub.L. No. 94–455, § 603, 90 Stat. 1574. These amendments illuminate the complementary roles of sections 57(a)(6) and 83. Since 1964 and prior to the Tax Reform Act of 1976, the Code provided that qualified and restricted stock options did not generate income to a corporate employee either upon receipt of the option or upon its exercise. Pub.L. No. 88–272, § 221(a), 78 Stat. 63 (1964). With the Tax Reform Act of 1969, however, although preserving the statutory exclusion from the income tax, Congress began to erode the preferential treatment accorded these statutory options by subjecting to the minimum tax the bargain accruing to the taxpayers upon their exercise. I.R.C. § 57(a)(6). The Tax Reform Act of 1976 completed the erosion by effectively eliminating the income exclusion theretofore accorded grantees of qualified and restricted stock options. The 1976 amendments to sections 422 and 424 subject all qualified and restricted stock options exercised after May 21, 1981, to the same tax treatment as nonstatutory stock options are presently subject, *i. e.*, income tax treatment under § 83. Furthermore, except for options granted pursuant to a written plan adopted

---

optionee who is also an insider, it has no effect whatsoever on the price that that stock will command in the market.

**9.** The Commissioner noted that § 16(b) would "not prohibit the optionee from transferring the

stock acquired through the exercise of the option. These provisions may serve only to require the return to the corporation of the 'insider profit' on the sale of such stock by the optionee." 1966–1 Cum.Bull. at 186.

before May 20, 1976, options granted after May 20, 1976, will likewise be accorded income tax treatment. *See* S.Rep. No. 94–938, 94th Cong. 2d Sess. 160–65 (1976), *reprinted in* [1976] U.S.Code Cong. & Admin. News pp. 3439, 3592–97. Section 57(a)(6) fills the gap during this transitional phase from income exclusion to income inclusion by subjecting to at least the minimum tax the bargain realized upon the exercise of options.

Given this scheme of tax treatment for qualified and restricted stock options, it seems wholly consistent with the legislative intent to employ the § 83(a)(1) valuation principles when ascertaining an item of tax preference under § 57(a)(6). "[Absent] a showing that [the challenged regulation] clearly contradicts the statute it purports to interpret," I must consider the regulation as a correct construction of the law. *Motors Insurance Corp. v. United States*, 530 F.2d 864, 873, 208 Ct.Cl. 571 (1976).

 Even assuming the invalidity of the regulation, however, and applying the estate tax valuation principles outlined above, I am persuaded that the Government must prevail, at least insofar as plaintiff predicates recovery upon the effect of § 16(b). I cannot agree with plaintiff that § 16(b) has any impact whatsoever upon the fair market value of the stock acquired under the option. Although I recognize that the operation of § 16(b) would have obvious financial consequences to the corporate insider who must disgorge any short-swing profits, it in no way affects "the price at which the property would change hands between a willing buyer and a willing seller." *See generally* Treas. Reg. § 20.2031–1(b). Section 16(b) does not prevent the insider from selling the stock, nor does it affect the stock in the hands of the purchaser. Plaintiff argues that the penalty imposed by § 16(b) creates a significant disincentive to dispose of the stock within six months of its acquisition and thereby removes the element of the "willing seller" from the calculus. This argument is unavailing; whether plaintiff is, in actuality, a willing seller is of no account. The formulation of fair market value requires an objective, not a subjective and individualized, frame of reference. Consequently, where there is a demonstrated market for the stock (here, the American Stock Exchange), the inquiry into fair market value should take cognizance only of stock attributes and market influences that would affect the price of the same type of stock if it were offered for sale. Whether a particular party would, in a particular set of circumstances, sell the stock is not an appropriate consideration. The Code concept of fair market value simply does not contemplate an inquiry into all of the peculiarly personal aspects of an individual's decision to buy or sell stock. *See Reynolds v. Commissioner*, 55 T.C. 172, 195 (1970). Therefore, while I would agree with plaintiff that amenability to § 16(b) might affect the *subjective value* of the stock to the taxpayer, I do not agree that the *fair market value* is affected or that the trading price of the stock should be discounted accordingly.

 Having rejected both the plaintiff's challenge to the regulation and his argument that the impact of § 16(b) must be considered when calculating the fair market value of the stock, I conclude that the Government is entitled to summary judgment on those issues. As I pointed out at oral argument, however, and as the Government now recognizes, it does appear that the IRS failed to apply the appropriate valuation principles when fixing the item of preference. Treasury regulation § 1.57–1(f) does not outline a special rule for ascertaining fair market value; it simply precludes consideration of all but nonlapse restrictions. Therefore, as the Government itself has conceded, resort to the definitions in the estate tax regulations is appropriate. Regulation § 20.2031–2(b) prescribes the method for determining the fair market value of stocks:

If there is a market for stocks or bonds, on a stock exchange, in an over-the-counter market, or otherwise, the *mean between the highest and lowest quoted selling prices on the valuation date is the fair market value per share* . . . . .

Treas. Reg. § 20.2031–2(b) (emphasis added).

In assigning as the fair market value of the stock acquired by Harrison the *highest*, rather than the mean, trading price, the IRS violated its own regulations and thereby overvalued the stock.

It would therefore appear that plaintiff is entitled to a refund, the exact amount of which may be determined by recalculating the amount of tax preference using the mean trading price of the stock on the American Stock Exchange on November 24, 1971, *i. e.*, $42.00 per share. As the precise amount is a minor detail that involves a matter of calculation only, I would, under other circumstances, simply permit the parties to stipulate to the figure and enter judgment for plaintiff in that amount. At oral argument, however, I inquired whether plaintiff claimed that the number of shares involved (12,000) was large enough to have had an effect on the fair market value of the stock. I also inquired whether such a contention had been raised in the refund claim and whether I had power to consider such an argument at this juncture if it had not been presented at the administrative level. I gave the parties an opportunity to brief this particular issue. Having considered the memoranda submitted and having reviewed the refund application presented by plaintiff, I conclude that the argument pertaining to the effect of the number of shares involved (the blockage discount) is not properly before me.

■ Plaintiff argues that the basis for recovery alleged in the refund claim, *i. e.*, "[t]he fair market value of the shares received by taxpayer pursuant to the exercise of the qualified stock options had a value substantially lower than the public trading price," is sufficiently broad to encompass the claim of blockage. Plaintiff's Supplemental Memorandum in Opposition to Defendant's Motion for Summary Judgment (Document No. 16) at 3. Regulation § 301.-6402–2(b)(1) requires that a refund claim "set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." Plaintiff contends that he has satisfied that obligation by including in the protest presented to the auditing agent the trading volumes of Franklin Mint stock on two days prior, and two days subsequent, to the valuation date.

I cannot agree either with plaintiff's characterization of the precise issue before the Commissioner or with the contention that the quotation of the trading volumes sufficiently alerted the Commissioner to the blockage theory. To be sure, plaintiff's refund claim challenged the stock's valuation for minimum tax purposes. Nevertheless, plaintiff's attack on the valuation of the stock and the calculation of the preference—from the initial protest to the presentation of the refund claim—concentrated on the effect of § 16(b) and the invalidity of the regulation that precluded consideration of § 16(b)'s impact on fair market value. This emphasis considerably narrowed the scope of the claim. Under the circumstances, the inclusion of the trading volumes for a few days proximate to the day on which the option was exercised did not, in my view, apprise the Commissioner of the blockage theory. In addition, the quotations alone did not furnish a sufficient factual basis for a refund on that theory for, as the Government quite rightly argues, there was no information about the number of outstanding shares or the market significance of a 12,000-share block.

■ Plaintiff argues, in effect, that once fair market value is placed in question, it is incumbent upon the Commissioner to inquire into anything and everything that might affect fair market value. To the contrary, it is plaintiff's burden to bring the grounds underlying his claim to the Commissioner's attention. *Herrington v. United States*, 416 F.2d 1029, 1032 (10th Cir. 1969). "It is not enough that in some roundabout way the facts supporting the claim may have reached [the Commissioner. His] attention should have been focused on the merits of the particular dispute . . .." *Angelus Milling Co. v. Commissioner*, 325 U.S. 293, 297–98, 65 S.Ct. 1162, 1165, 89 L.Ed. 1619 (1945). Elaborating upon this principle, the Court of Claims has stated:

"Neither the Commissioner nor his agents can be expected to ferret out any possible grounds for relief which a taxpayer might assert. Availability of information is not equivalent to notice that a claim is asserted based on that information. That claim must somehow be communicated to the Service."

*Union Pacific R. R. Co. v. United States*, 389 F.2d 437, 445, 182 Ct.Cl. 103 (1968).

These principles are particularly apt here where the facts that assertedly form the basis of the theory now advanced lie buried in the administrative record, surfacing only in the initial protest presented to the auditing agent. Plaintiff complains that the IRS has had three opportunities to make an intelligent administrative review of his claim. The same might more properly be said of plaintiff—that he has had three opportunities to ensure an intelligent administrative review of all factors affecting fair market value. It was, after all, plaintiff's obligation to bring the blockage theory and the facts in support thereof to the Commissioner's attention. Listing in the protest to the auditing agent the trading volumes of the stock over a four-day period hardly satisfied that obligation. "The Commissioner, through his agents, cannot be expected to formulate from raw facts a taxpayer's unarticulated claim." *Old Dominion Box Co. v. United States*, 477 F.2d 340, 347 (4th Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973).

Because I conclude that the blockage issue was not raised in the first instance at the administrative level, I cannot consider that claim at this time. Harrison, however, has expressed his intention to pursue this theory in a timely-filed amended claim for refund. It would therefore serve little purpose to enter judgment for the taxpayer in an amount that might change if his renewed refund application is approved in the administrative process. Accordingly, I will enter partial summary judgment for the Government on the following issues: (1) the plaintiff's challenge to the regulation and (2) the plaintiff's contention that § 16(b) affects fair market value; and I will dismiss plaintiff's complaint without prejudice.

## ORDER

This 24th day of July, 1979, it is

ORDERED that Defendant's Motion for Summary Judgment is GRANTED with respect to the following of plaintiffs' theories of recovery: (1) that Treas. Reg. § 1.57–1(f)(3) is invalid because it is inconsistent with I.R.C. § 83(e)(1), and (2) that § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) (1976), influenced the fair market value of plaintiffs' stock. It is

FURTHER ORDERED that in all other respects plaintiffs' Complaint is DISMISSED without prejudice.