ANCHOR SAVINGS BANK,
Plaintiff–Appellee,

v.

ZENITH MORTGAGE CO.,
Defendant–Appellant,

v.

KINGS PARK APARTMENTS, INC., Sundown Apartments New York Associates, Jay Fikes and Pioneer National Title Insurance Co., Third–Party Defendants.

No. 272, Docket 80–7427.

United States Court of Appeals,
Second Circuit.

Argued Oct. 1, 1980.

Decided Nov. 24, 1980.

---

Peter J. Mastaglio, Cullen & Dykman, New York City, for plaintiff–appellee.

Edward M. Sills, New York City, for defendant–appellant.

Before LUMBARD, OAKES and NEWMAN, Circuit Judges.

OAKES, Circuit Judge:

This appeal is from a grant of summary judgment in favor of plaintiff Anchor Savings Bank (Anchor), a mortgagee whose mortgages on two pieces of property in Lubbock, Texas, were serviced by defendant Zenith Mortgage Company (Zenith). The United States District Court for the Eastern District of New York, Eugene H. Nickerson, Judge, held in this diversity case that Zenith had violated its mortgage servicing contract with Anchor by failing to collect and pay certain real estate taxes and by failing to notify Anchor about the related defaults by the mortgagor. Zenith also neglected to collect sufficient funds for the escrow account used to pay current taxes and insurance premiums. Despite the fact that Anchor had neither paid the taxes and insurance nor attempted to foreclose on the property, the court below awarded judgment to Anchor in the amount of the uncollected funds, stating that to the extent Zenith pays the judgment, it would be subrogated to Anchor's rights. We reverse the judgment and dismiss the case on the basis that the mortgagor's liability to pay taxes and insurance is primary and Zenith's liability on the mortgage servicing contract only secondary, with the result that unless and until Anchor advances funds or forecloses the mortgage, Anchor has sustained no damage. Our dismissal is without prejudice to an action for recovery by Anchor in the future.

There is no dispute as to the basic facts. In the spring of 1973 Anchor and Zenith entered into an agreement under which Zenith was to service for Anchor a mortgage on two lots of land located in Lubbock, Texas, containing an apartment complex and swim club. The owner of the property was Kings Park Apartments, Incorporated, and the note secured by the mortgage was for $2,450,000, payable over 25 years with interest at 9%. The mortgage servicing contract provides that Zenith will "service the mortgage in accordance with acceptable mortgage practices of prudent lending institutions." Zenith is to "estimate, as provided in the mortgage, [the] annual amount of . . . taxes, assessments, . . . and insurance premiums that will become due and payable, in order to establish monthly installments," and diligently to collect all payments due under the mortgage.

The contract further provides that to the extent afforded by funds of the mortgagor or Anchor, Zenith will "promptly discharge" the mortgagor's obligations as listed in the mortgage. Zenith is required to segregate and hold for Anchor in an escrow account all funds received from the mortgagor that are not applicable to payment of principal and interest, until such funds are "applied in accordance with the terms of the mortgage." In addition, no funds received by Zenith for principal and interest are to be paid over to Anchor unless Zenith has both received payments due on the mortgagor's other obligations as listed in the mortgage

and fully discharged those obligations. The contract also obligates Zenith in the event of any default by the mortgagor to send Anchor a statement listing the date and amount of the default. In the case of a default, Zenith when authorized by Anchor must institute foreclosure proceedings.

From 1975 through 1978 Zenith failed to collect and to pay certain school, city, county and state taxes due on the premises and failed to give the required notice to Anchor. The 1975 and 1976 school and city taxes were the subject of a dispute that began in 1975 when Kings Park Apartments filed a tax certiorari proceeding in the District Court of Lubbock County and paid $38,469.82 into an escrow account, and continued when Kings Park Apartments challenged the 1976 assessment, depositing an additional $26,800 into the special account. In December 1976, the Lubbock County District Court ordered $47,376.97 to be released from the special account to pay for the 1975 taxes and $2,243.77 to be held in the account for taxes owed on improvements whose ownership was disputed. The court also determined that the amount due in 1976 for city and school taxes was $50,423.66, of which $2,280.08 was to be reserved on the disputed improvements, but the court made no order concerning the disposition of the $19,742.70 remaining in the special savings account. It appears that no steps have been taken by either of the parties or by the mortgagor to have the deposit applied to taxes due on the property.

Regarding the 1977 and 1978 taxes, Zenith hired the Pioneer National Title Insurance Company (Pioneer) in May 1977 to estimate for Zenith the annual taxes owing on the property. Pioneer, however, was under the impression that only one parcel of land was involved. As a result Zenith failed to collect or pay $33,382.50 in taxes

for the years 1977 and 1978. Pioneer paid Zenith $5,847.04 to cover penalties on the delinquent taxes and Zenith then paid this sum to Anchor, which received and accepted it.

After this lawsuit was brought, the City of Lubbock commenced an action to foreclose its tax liens on the premises naming as defendants Anchor and Sundown Apartments New York Associates (Sundown), a New York limited partnership to which Kings Park Apartments at some point had transferred ownership of the property. Thereafter, Sundown filed a bankruptcy petition in the United States District Court in Fort Worth, Texas, pursuant to Chapter XII of the old federal bankruptcy law, which pertains to real property arrangements by persons other than corporations. This petition has automatically stayed any foreclosure proceedings and Anchor has not sought to vacate the stay.

The district court held in this case that Zenith had breached its duties under the contract by failing both to collect and pay taxes and to report defaults to Anchor. It concluded that Anchor had no duty to foreclose on the property and that damages could be ascertained before a foreclosure occurred.[1] As of October 1979 the total amount of taxes owing, including penalties and interest, was $111,712.36. Zenith had on hand in escrow payments from the mortgagor of $58,161.92. The judgment awarded to Anchor by the district court included the difference of $53,550.44, plus an additional $52,875.04 that Anchor argued Zenith should have collected for the escrow account.

In our view, because Zenith was Anchor's agent for collection,[2] its liability for the mortgagor's nonpayment of taxes is secondary. Anchor held and still holds the mort-

---

1. According to a letter in the record from an appraiser to Zenith's attorney, the property is worth between $2,850,000 and $3,100,000, well in excess of the principal due and the unpaid taxes.

2. In the mortgage servicing contract Zenith is described as an independent contractor. None-

theless, Zenith, as independent contractors may be, was an agent. *See Columbia Broadcasting System, Inc. v. Stokely–Van Camp, Inc.*, 552 F.2d 369, 375–76 (2d Cir. 1975); 1 Restatement (Second) of Agency § 14N, comment a (1958).

gage note, its valid security interest, and, subject to approval of the bankruptcy court in the Chapter XII proceeding, it can enforce the primary obligation of the mortgagor to pay taxes, insurance and any mortgage charges. For this reason the claim of Anchor is premature and Zenith may not be held liable at this time for noncollection.

An analogous New York case supports our view that Zenith is not primarily liable for the uncollected funds. In *Hoffower v. Pennsylvania Exchange Bank*, 8 A.D.2d 585, 183 N.Y.S.2d 620 (1959), checks were drawn upon the defendant bank and forwarded through banking channels for collection. The bank did not comply with directions to protest and wire nonpayment until 22 or 23 days after receipt of the checks. The court reversed a judgment for the payee on the ground that the payee was not entitled to recover the face amount of the checks because the record did not support a finding that he had suffered damages equal to that figure. As the court said, the payee had not lost any right of action against the drawer of the checks and "for all that appears in the record, plaintiff is in the same situation it would have been in had the bank given earlier notice of nonpayment," 8 A.D.2d at 586, 183 N.Y.S.2d at 621. Quoting from *First National Bank v. Fourth National Bank*, 77 N.Y. 320, 330 (1879), the court in *Hoffower* noted that "[t]he plaintiff is entitled to indemnity, and no more, for the loss caused by the fault of the defendant, and it must show the extent of such loss." *See also Loan Service Corp. v. Bender Ford Sales, Inc.*, 16 A.D.2d 1033, 1034, 230 N.Y.S.2d 88, 90 (1962).

Our view is also supported by an earlier federal circuit court case, *Gray v. City of Santa Fe*, 89 F.2d 406, 411 (10th Cir. 1937). There a city was under a duty to collect special assessments for the benefit of holders of certificates or bonds issued to pay the costs of municipal improvements. The court held that when no assessment has been made but the power to assess remains, or when an invalid assessment has been made but the power to reassess exists, or when an assessment has not been collected but the assessment still subsists and may be collected, then the certificate holder or bondholder may seek mandamus against the city officials to compel assessment and collection. Because assessments were still possible, the court concluded that the city was not liable for the amount of the unpaid bonds and interest. The court reasoned as follows:

> Where the owner of an obligation enters into a contract with another to act as agent of the owner in the collection of such obligation and to take certain steps to enforce the obligation and the agent fails and neglects so to do, would the agent be liable to the owner of the obligation for the principal thereof with interest when the owner may still enforce payment of the obligation by the debtor? We think not. It seems to us the same rule should apply here.

*Id.* The court held, therefore, that the case should have been dismissed without prejudice to the bringing of another action for damages properly recoverable for the alleged breaches of contract. *See Gray v. City of Santa Fe*, 135 F.2d 374 (10th Cir. 1941) (held in subsequent suit on same facts that city was liable for damages caused by shrinkage in value of the assessed property).

Anchor argues that it has been damaged because the value of its collateral has decreased by the amount that Zenith omitted to collect. But for all that appears in the record, the value of the collateral actually may have increased during the period in which Zenith failed to make collections. Moreover, unless and until a sale of the premises fails to satisfy both the amount of indebtedness due to Anchor and any unpaid liens, there has been no actual loss. To be sure, the district court is correct that the contract between Anchor and Zenith does not create a duty on the part of Anchor to foreclose on the mortgage but merely a duty on the part of Zenith to do so if Anchor directs that it should. However, at any time Anchor may authorize Zenith to foreclose and seek removal of the stay in the Chapter XII proceeding if it is still pending.

In this case then, it is really a question of who should be the first to be held to account for the tax payments. Foreclosure is an ordinary and commonplace method for enforcing mortgage defaults. And until Anchor has foreclosed, any actual loss due to Zenith's negligence *cannot* be ascertained. Absent authorization by Anchor to foreclose, the subrogation rights given to Zenith by the judgment below have no real value for Zenith. Zenith cannot itself foreclose on the property. At most it could file a claim in the Chapter XII proceedings, a claim that would be secondary to the mortgage and to any tax liens.

Because Zenith's liability for the nonpayment of taxes is secondary and because there has been no payment of taxes or insurance and no foreclosure, Anchor has yet to suffer any damage due to Zenith's breach of contract. Indeed, such damage may never occur. The judgment therefore is reversed and the case dismissed without prejudice to the bringing of an action by Anchor upon the occurrence of actual damage.