EASTERN SERVICE CORPORATION, Appellee,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellant.

No. 768, Docket 80–4188.

United States Court of Appeals, Second Circuit.

Argued Feb. 24, 1981.

Decided May 28, 1981.

---

Donald B. Susswein, Washington, D. C. (M. Carr Ferguson, Asst. Atty. Gen., Michael L. Paup, Richard Farber, Tax Division, Dept. of Justice, Washington, D. C., of counsel), for appellant.

Robert A. Jacobs, Milgrim, Thomajan, Jacobs & Lee, P. C., New York City, for appellee.

Before FEINBERG, Chief Judge, OAKES, Circuit Judge, and NEAHER, District Judge.*

OAKES, Circuit Judge:

This appeal by the Commissioner from an adverse ruling of the Tax Court presents the somewhat abstruse question whether a "seller-servicer" of mortgages required to buy Federal National Mortgage Association (FNMA) stock as a seller, and to retain it as a servicer, is entitled to deduct as a business expense a portion of the price it paid for the FNMA stock by virtue of section 162(d) of the Internal Revenue Code. The Tax Court, Richard C. Wilbur, Judge, held that the statutory reference in section 162(d) to "fair market value" mandates that the ownership requirement on the servicer be taken into account so as to reduce the present value of the FNMA stock and thereby permit a business expense deduction. The Commissioner argues on appeal that section 162(d) does not apply in this case to permit such a deduction because the quoted market price of FNMA stock was at all times greater than the issuance price paid by appellee Eastern Service Corporation as a seller of mortgages to FNMA. The Commissioner contends that the appli-

cation of section 162(d) was erroneous because it was premised on treating Eastern's stock as if it were a "restricted" stock for purposes of determining "fair market value" when, in fact, the stock was freely alienable and could be sold at any time. Indeed, it is the Commissioner's position that the FNMA stock was a capital asset necessary to Eastern's business and that the acquisition cost of the stock is nondeductible. We agree with the Commissioner and, therefore, reverse the decision of the Tax Court.

## I. FACTS

Appellee Eastern was a mortgage seller-servicer during 1969, the tax year in issue. In its business, Eastern originated mortgage loans on residential properties and sold the loans to permanent institutional investors, including FNMA. After the sales Eastern serviced the accounts of the institutional investors, collecting the monthly payments under the mortgages and remitting the funds to the investor, to taxing authorities, and to insurance companies.[1] For performing these duties, Eastern received a servicing fee amounting to about one-half of one percent of the mortgage principal.

Eastern preferred to sell mortgages to institutional investors other than FNMA because FNMA exacted a nonrefundable commitment fee and had certain stock purchase and stock retention requirements. But in periods of tight credit, Eastern and other mortgage sellers turned increasingly to FNMA, which could gather funds for the mortgage market because of its size and its preferred borrowing status as a federally-sponsored credit agency. In fact, during 1968 and thereafter FNMA was the principal purchaser of mortgages originated by Eastern. These mortgages typically have a twenty-five to thirty-year term, but if the home is sold, the owner refinances, or the mortgage is prepaid, then the life of the mortgage will be shorter. The average life

---

* Of the Eastern District of New York, sitting by designation.

1. *See generally Anchor Savings Bank v. Zenith Mortgage Co.*, 634 F.2d 704, 705–06 (2d Cir. 1980) (describing duties of mortgage servicing agent).

of the FNMA mortgages serviced by Eastern during 1969, the tax year in question, was approximately fifteen years.

Under the FNMA Charter Act, when mortgage sellers such as Eastern sell mortgages to FNMA, they must make nonrefundable capital contributions to FNMA as measured by a percentage of the unpaid mortgage principal. 12 U.S.C. § 1718(b).[2] In return for these capital contributions mortgage sellers are issued shares of FNMA's common stock. Prior to September 1968, sellers to FNMA, who made the capital contribution and received FNMA stock, could resell the stock without any restriction. In 1968, however, Congress amended section 303(c) of the FNMA Charter Act, 12 U.S.C. § 1718(c), to require each FNMA mortgage servicer to own a minimum amount of FNMA stock.[3]

In 1969, Eastern originated first mortgage loans totalling $56,300,000 of which some $33,000,000 worth were sold to FNMA. Pursuant to the stock purchase requirements, Eastern retained the minimum amount of FNMA stock required of it as a servicer, which, allowing for subsequent stock splits, came to some 59,216 shares and which had an aggregate purchase price of $498,513. In its 1969 federal income tax return Eastern reduced its otherwise taxable income by this $498,513.

Eastern believed that the requirement that it retain ownership of a specified amount of FNMA stock for the life of the mortgages it was servicing for FNMA made the fair market value of the stock far less than the price paid for it and, thus, justified the deduction. But the Commissioner took exception to Eastern's treatment and determined a deficiency of $281,639 in Eastern's income tax. The Tax Court heard the case and adopted in large part Eastern's position, ruling that the fair market value of the FNMA stock was only twenty-five percent of its market price and, accordingly, that under section 162(d) of the Internal Revenue Code,[4] Eastern was entitled to deduct seventy-five percent of the price of its FNMA stock on its 1969 tax return. *Eastern Service Corp. v. Commissioner*, 73 T.C. 833 (1980). From the Tax Court's decision, the Commissioner now appeals.

## II. DISCUSSION

### A. *Background*

Although this is a case of first impression, the tax treatment of FNMA stock purchases has long been of concern to mortgage companies, the Internal Revenue Service, the Tax Court, and the Congress. It is helpful, therefore, in order to reach a solution to the instant case to review briefly the history of this problem.

---

2. 12 U.S.C. § 1718(b), as it governed Eastern's transactions with FNMA during 1969, provided in pertinent part:

The corporation shall accumulate funds for its capital surplus account from private and other sources by requiring each mortgage seller to make payments of nonrefundable capital contributions, equal to not more than 2 per centum nor less than 1 per centum of the unpaid principal amounts of mortgages purchased or to be purchased by the corporation from such seller....

3. Following the 1968 amendments, 12 U.S.C. § 1718(c) provided in pertinent part:

The corporation shall issue from time to time, to each mortgage seller ... its common stock evidencing any capital contributions ... made by such seller ... pursuant to subsection (b) of this section.... The corporation shall at all times require each servicer of its mortgages to own a minimum amount of common stock of the corporation, measured by its stated value. Such mini-

mum amount shall not exceed 2 per centum ... of the aggregate outstanding principal balances of all mortgages of the corporation which have been purchased subsequent to [September 1, 1968,] and which are then serviced by such servicer for the corporation....

4. Section 162(d) of the Internal Revenue Code, 26 U.S.C. § 162(d), provides:

*Capital contributions to Federal National Mortgage Association.*—For purposes of this subtitle, whenever the amount of capital contributions evidenced by a share of stock issued pursuant to section 303(c) of the Federal National Mortgage Association Charter Act (12 U.S.C., sec. 1718) exceeds the fair market value of the stock as of the issue date of such stock, the initial holder of the stock shall treat the excess as ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business.

During the period from 1954 to September 1968, when FNMA operated as a quasi-governmental corporation, FNMA raised private capital from the financial institutions that sold mortgages to it by requiring them to make nonrefundable capital contributions equal to a specified percentage of the outstanding mortgage principal. In exchange for these payments, FNMA issued shares of its non-voting, $100 par value common stock to the mortgage sellers. The problem, however, was that the mortgage sellers had to purchase the prescribed amounts of FNMA stock at the par value of $100, while the price of the stock on the open market was appreciably less. Although commentators generally felt that the difference between par and market value should be regarded as a business expense, deductible in the year of issue, e. g., Mertens, *Law of Federal Income Taxation, Code Commentary* § 162(d), at 278 (1979), the Commissioner initially took the position that the entire purchase price must be capitalized, with no allowance for business expense deductions, Rev.Rul. 58–41, 1958–1 C.B. 86.[5]

Congress, viewing the Commissioner's ruling as unfair to mortgage sellers, effectively overruled the Commissioner's position when in 1960 it enacted section 162(d) of the Internal Revenue Code,[6] explicitly allowing a business deduction for mortgage sellers whenever the amount of capital contributions for the FNMA stock exceeded the fair market value of that stock on the date of issuance.[7] After Congress enacted section 162(d), the Tax Court decided *Ancel Greene & Co. v. Commissioner*, 38 T.C. 125 (1962), involving a tax year prior to the effective date of section 162(d). The court followed in principle section 162(d), holding that only the fair market value of the FNMA stock rather than the entire purchase price was includable in the taxpayer's gross income.[8] The Commissioner subsequently acquiesced in the *Ancel Greene* decision by revoking the prior revenue ruling, but the Commissioner nonetheless ruled that *Ancel Greene* had no application to transactions after the effective date of section 162(d). Rev.Rul. 63–44, 1963–1 C.B. 11.

Then in 1968 the rules governing private shareholder transactions with FNMA changed and it is from this change that the problem in the case at bar arises. Prior to September 1, 1968, there were no restrictions on the resale of stock acquired by a mortgage seller-servicer that sold mortgages to FNMA. But the 1968 amendment to section 303(c) of the FNMA Charter Act, 12 U.S.C. § 1718(c), converted FNMA into a privately-owned corporation and required a mortgage servicer to hold a specified minimum amount of FNMA stock for the life of each mortgage it serviced for FNMA. Regulations promulgated by FNMA under section 303(c) of the FNMA Charter Act and

---

**5.** This revenue ruling was based principally upon a decision of this court, *Exposition Souvenir Corp. v. Commissioner*, 163 F.2d 283 (2d Cir. 1947). *Exposition Souvenir* held that bidders for concessions at the New York World's Fair, who were required to purchase debentures issued by the Fair to obtain the concessions, had to treat the debentures as capital assets and the loss occurring on the sale thereof as a long-term capital loss. Thus, Revenue Ruling 58–41 extended the reasoning of *Exposition Souvenir* to purchases of stock of FNMA on the basis that "the taxpayer is required to make such an investment and, although investing in these securities may not be his primary motive in acquiring them, they are necessarily held as investments and, as such, must be treated as capital assets." 1958–1 C.B. at 88.

**6.** See note 4 *supra*.

**7.** No version of the statute has ever said anything about the situation that occurs when the fair market value of the stock exceeds the amount of the capital contribution.

**8.** The court in *Ancel Greene* also ruled that the stock sold by the taxpayer was a capital asset, with the fair market value at the date of issuance as the basis. In ruling that the stock was a capital asset, the court distinguished *Ancel Greene* from an earlier tax case, *McMillan Mortgage Co. v. Commissioner*, 36 T.C. 924 (1961) (held that gains or losses on the subsequent sale of FNMA stock were ordinary gains or losses), on the basis that the taxpayer in *McMillan Mortgage* held its FNMA stock for a relatively short period of time and with no intent to hold it as an investment, while the taxpayer in *Ancel Greene* held the stock as an investment for periods in excess of a year and a half.

incorporated into its mortgage servicing contracts, also required that prescribed amounts of FNMA stock be owned as a condition of servicing home mortgages purchased by FNMA.

For the purposes of this case, the parties have stipulated that the mean bid and asked price of the FNMA stock in the over-the-counter market at all relevant times was not less than the issue price of the FNMA stock purchased by Eastern. This means that the capital contributions Eastern was required to make for the FNMA stock were not in excess of the price that the stock was selling for on the open market; but with the retention requirements Eastern could not sell the stock so long as it serviced the outstanding mortgages. What we must decide, then, is the applicability of section 162(d) of the Internal Revenue Code, and its reference to using the "fair market value of the [FNMA] stock" to determine business deductions, to a situation not contemplated at the time Congress enacted the provision.

Eastern argues that the statutory restrictions encumbering the FNMA stock reduced its "fair market value" as contemplated by section 162(d) and entitled Eastern to take a deduction as held by the Tax Court here. In the alternative, Eastern adopts the reasoning of *Ancel Greene*, arguing that when the value of the FNMA stock is included in the amount realized from the sale of its mortgages, only a discounted fair market value should properly be included as income because of the restrictions on the stock. As a third position, Eastern contends that because it would be required to terminate its profitable mortgage servicing business if it sold its FNMA stock, it has realized no income attributable to that stock until it sells the stock and reduces the stock's value "to its unfettered possession."

The Commissioner on the other hand looks to the fact that there were no legal restrictions and the sale of the stock by Eastern and that the stock's "real" fair market value was in excess of the purchase price Eastern paid as a mortgage seller. Thus, the Commissioner argues that the restrictions imposed by section 303(c) of the FNMA Charter Act, 12 U.S.C. § 1718(c), on mortgage servicers are irrelevant to the application of section 162(d) or for that matter to any other method for claiming a tax deduction in this case.

## B. *Characterization of the FNMA Stock*

It is not only desirable, it is necessary in a complex case to look at the economic realities of the situation in order to determine the appropriate tax consequences. This is more easily said, however, than done. The "realities" differ depending on the perspective from which they are seen. In this case, we may recall the advice given by Justice Cardozo in another tax context: "Life in all its fullness must supply the answer to the riddle," *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). And the first riddle we face is whether the FNMA stock in question is truly "restricted stock."

The Tax Court decided that the FNMA stock was in essence restricted because it "[could] not be resold for a length of time" and, therefore, that its fair market value was less than the quoted market price of freely alienable stock. 73 T.C. at 844–45. Eastern, as already noted, adopts this position for two of its lines of argument. But the characteristics of the FNMA stock involved in this case are somewhat different from those of the restricted stock considered by the authorities relied upon by Eastern and by the Tax Court, *e. g., Bassick v. Commissioner*, 85 F.2d 8 (2d Cir.), *cert. denied*, 299 U.S. 592, 57 S.Ct. 120, 81 L.Ed. 436 (1936); Rev.Rul. 77–287, 1977–2 C.B. 319; Rev.Rul. 59–60, 1959–1 C.B. 237 *as modified by* Rev.Rul. 65–193, 1965–2 C.B. 370.

"Restricted stock" as that term is used in the above authorities as well as by commentators in general, *e. g.*, 1 A. Bromberg & L. Lowenfels, *Securities Fraud & Commodities Fraud* § 4.7 (635), at 88.114 (1979), refers to those securities that either by contract or by law cannot be distributed to the public. In other words, a restricted security is one that has no market, which, of course, is why

it is necessary to develop guidelines for calculating the value of that security. This is not the case with the FNMA stock held by Eastern. That stock, like all FNMA stock, was freely transferable at all times. There are no legal restrictions on FNMA stock and it is traded publicly. *See* 12 U.S.C. § 1718(a) (capitalization provisions of FNMA). The only restrictions here were those on Eastern due to its status as a mortgage servicer. If at any time Eastern were to go out of the servicing business, which in fact it did in 1972, it was perfectly free to sell the FNMA stock at that time.

To be sure, Eastern may have had a significant economic incentive—continuing to service FNMA mortgages—for not selling its stock. But whether a particular party will sell its stock under a particular set of circumstances is not an appropriate consideration for determining the fair market value of a stock. *Kolom v. Commissioner*, 644 F.2d 1282, 1286 (9th Cir. 1981) (restrictions placed upon the sale of stock by section 16(b) of the Securities Exchange Act of 1934 may affect the taxpayer's willingness to sell his stock but affects neither the marketability nor the market value of the stock itself); *Harrison v. United States*, 475 F.Supp. 408, 415 (E.D.Pa.1979) (amenability to section 16(b) of the Securities Exchange Act of 1934 may affect the subjective value of the stock to taxpayer, but it does not affect the fair market value of the stock and the trading price should not be discounted), *aff'd*, 620 F.2d 288 (3d Cir.

1980). Rather, the fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *United States v. Cartwright*, 411 U.S. 546, 551, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973), *quoting* Treas.Reg. § 20.2031–1(b). And this formulation of fair market value requires an objective as opposed to a subjective or individualized frame of reference. *Kolom*, at 1286; *Harrison*, 475 F.Supp. at 415. Thus, the fair market value of the stock purchased by Eastern should not be discounted simply because Eastern felt constrained to retain the stock for a substantial period of time.

Viewing the situation in this light, we cannot uphold the Tax Court on the grounds that it relied upon in its opinion. Congress intended section 162(d) of the Internal Revenue Code to benefit mortgage sellers who are required to purchase FNMA stock for more than its market price. That situation is not present here; indeed the exact opposite is the case because Eastern was required to purchase stock at an issuance price which was in fact less than the quoted market price.[9]

Furthermore, in cases analogous to this one, involving stock ownership requirements imposed by Congress on taxpayers doing business with federally-chartered corporations, the Supreme Court has held that

---

**9.** Both parties argue at length about whether Eastern's mortgage selling and mortgage servicing activities must be considered as severable and distinct or as two aspects of a single integrated business. The Commissioner, by treating them as distinct operations, argues that because Eastern did not have to fulfill the FNMA mortgage servicer's stock ownership requirement by acquiring the mandated shares directly from FNMA, then it is inappropriate to apply section 162(d) to this case. In other words, if the taxable event is characterized as a "purchase" by Eastern, the mortgage servicer, of FNMA stock, then there has not been an issuance of FNMA stock in exchange for capital contributions. Of course, Eastern argues, and the Tax Court agrees, that they have "a tandem operation representing two sides of the same business coin." According to this view,

the FNMA stock issued to Eastern, the mortgage seller, in exchange for capital contributions had to be retained by Eastern, the mortgage servicer. The shares Eastern held as mortgage servicer, therefore, were not purchased, but were received as part payment for the mortgages Eastern sold to FNMA and, as such, the remedial statute, section 162(d), should apply.

We simply need not resolve this dispute. We are willing to accept *arguendo* that Eastern's business was in fact a tandem operation and that it did not service without selling. The fact remains, however, that Eastern is not entitled to a deduction under section 162(d) because the quoted market price (and as just demonstrated, the fair market value) of its FNMA stock concededly was in excess of the issuance price.

the securities purchased are capital assets of value and that their cost is nondeductible. The first of these cases is *Commissioner v. Lincoln Savings & Loan Association*, 403 U.S. 345, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971). The Supreme Court held there that the "additional premium" paid by a state-chartered savings and loan association to the Federal Savings and Loan Insurance Corporation (FSLIC), as required by the National Housing Act, was not deductible for income tax purposes as an ordinary and necessary business expense under section 162(a) of the Internal Revenue Code. In its opinion, the Court explained that the payment served to create or enhance for the savings and loan association what was essentially a separate and distinct additional asset and that, as an inevitable consequence, the payment was capital in nature and not an expense deductible under section 162(a). *Id.* at 354, 91 S.Ct. at 1899. Among the points made by the Court to support the characterization of the compulsory payment as a capital expenditure, the fact that Congress had designated that payment as a partial substitute for an ownership requirement in Federal Home Loan Bank (FHLB) stock was emphasized. The Court reasoned that because the FHLB stock was an asset and its acquisition was capital in nature, then the new compulsory payment, which was also designed to provide protection for the insured institution and its depositors, was a capital expenditure as well. *Id.* at 356, 91 S.Ct. at 1900.

Similarly, in *United States v. Mississippi Chemical Co.*, 405 U.S. 298, 92 S.Ct. 908, 31 L.Ed.2d 217 (1972), the Supreme Court had to determine the tax treatment of a stock ownership requirement imposed by the Farm Credit Act on agricultural cooperatives that borrowed money from banks that had been chartered by the federal government, as part of the federal land bank system, for the purpose of loaning money to cooperatives. Despite the fact that the market for the stock was "virtually nonexistent"—the stock paid no dividends, was transferable only to other cooperatives, and

could be redeemed only subject to certain conditions, *id.* at 307–08, 92 S.Ct. at 913–14 —the Court held that "[s]ince the security is of value in more than one taxable year, it is a capital asset within the meaning of § 1221 of the Internal Revenue Code, and its cost is nondeductible." *Id.* at 310, 92 S.Ct. at 915. In rejecting the taxpayer's position that the formal stock purchases were, in substance, interest payments and therefore deductible, the Court emphasized the congressional purposes behind the legislative scheme enacted: "While Congress might have been able to achieve the same ends through additional interest payments, it chose the form of stock purchases. This form assures long-term commitment and has bearing on the tax consequences of the purchases." *Id.* at 312, 92 S.Ct. at 916.

Although Eastern argues that these analogous cases are not relevant here, we do not see how to avoid the force of these opinions. The congressional purpose behind the 1968 amendment to the FNMA Charter Act appears quite similar to that considered in *Mississippi Chemical*. The House Report to the 1968 amendment stated:

> For the purpose of encouraging the users of FNMA's services to develop and maintain their interest in and control of the corporation, each servicer of mortgages for FNMA would be required to own at all times a minimum amount of FNMA common stock.

H.Rep.No.1585, 90th Cong., 2d Sess., *reprinted in* 2 [1968] U.S.Code Cong. & Ad. News 2873, 2945. The report also explained that FNMA would "have a status analogous to that of the Federal land banks and Federal home loan banks." *Id.* at 2944. Thus, it appears that Congress imposed the stock ownership requirement in part for the express purpose of compelling Eastern and other mortgage servicers to acquire a long-term commitment to and interest in FNMA. As in *Lincoln Savings & Loan* and *Mississippi Chemical*, therefore, the required stock purchases should be regarded as capital assets for which no current deduction is allowable.[10]

10. If the issuance price of the FNMA stock had been greater than the fair market value of that stock, then even though the stock held by Eastern as a mortgage servicer is a capital asset,

## C. Income Realization Theories

We must now address Eastern's two alternative arguments that: (1) on the basis of *Ancel Greene & Co. v. Commissioner*, 38 T.C. 125 (1962), *acq.*, Rev.Rul. 63–44, 1963–1 C.B. 11, and the restrictions on the FNMA stock in this case, Eastern should include in its income only the discounted fair market value of the stock; and (2) the severe nature of the restrictions on Eastern's right to dispose of its FNMA stock allows Eastern to exclude the entire value of the stock from the amount realized on the sale of its mortgages to FNMA. In light of the above discussion, we can dispose of these arguments rather easily.

First, the key difference between this case and *Ancel Greene* is that in the latter the fair market value of the FNMA stock was considerably less than the issuance price of that stock. The Tax Court in *Ancel Greene*, therefore, followed the principle of section 162(d) by not including the added price as income represented by the stock.[11] But in the case at bar, we have already decided that the fair market value of the FNMA stock was equal to or greater than the issuance price. Thus, the analogy to *Ancel Greene* fails and Eastern must realize as income an amount equal to the price it paid for the FNMA stock.[12]

As for Eastern's argument that it realized no income from the acquisition of the FNMA stock, this is simply incorrect. There is no question in this case that Eastern acquired record ownership of the FNMA stock, obtained physical possession of the stock, was legally entitled to pledge the stock, and indeed could sell it on the open market. In situations similar to this one, courts have rejected the "no realization" theory. *See, e. g., Key Homes, Inc. v. Commissioner*, 271 F.2d 280 (6th Cir. 1959); *Flamingo Resort, Inc. v. United States*, 485 F.Supp. 926 (D.Nev.1980). The only authority cited by Eastern, Rev.Rul. 80–300, 1980–45 I.R.B. 6, is inapposite. That ruling involved employee stock appreciation rights (SARs) exercisable after one year, which entitled employees to cash payments equal to the difference between the fair market value on the date of exercise and the value on the date of issuance of the SARs. The Commissioner held that an employee did not constructively receive the SARs before they were actually exercised and that only when they were exercised would the cash payment to which the employee was entitled be includable in gross income. *See also Cohen v. Commissioner*, 39 T.C. 1055 (1963) (periodic increments in cash surrender value of life insurance policies do not constitute income in the years credited and only when the policy is surrendered is there a realization of income). Here, however, Eastern as a mortgage seller promptly received its stock and, although required to retain a portion of the stock as a mortgage servicer, Eastern did possess the stock itself rather than merely a right to it. Eastern's reluctance to sell was only a consequence of its desire to maintain its status as a mortgage servicer.

Judgment reversed.

---

Eastern in its role as a mortgage seller would have been entitled to a business expense deduction for the difference as provided by section 162(d) of the Internal Revenue Code. *See Ancel Greene & Co. v. Commissioner*, 38 T.C. 125 (1962). When as here, however, the issuance price is less than or equal to the fair market value, then whether or not section 162(d) applies to the tandem operation of selling and servicing, see note 9 *supra*, no deduction would be in order.

**11.** See note 8 *supra*.

**12.** See note 10 *supra*.